IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                        Criminal No. 3:08cr199

JAMES EUGENE VENABLE

## MEMORANDUM OPINION

This matter is before the Court on the Defendant's Motion to Dismiss (Docket No. 148).  For the reasons that follow, the motion will be denied.

## BACKGROUND

On January 8, 2008, Gary Wayne Turner ("Turner") and Michele Lynn Zechman ("Zechman") burglarized a home in Campbell County, Virginia, and stole eleven firearms.  Both Turner and Zechman are Caucasian.  On January 28, 2008, Captain L.T. Guthrie of the Campbell County Sheriff's Office contacted Richmond Police Detectives Daniel O'Connell and Jack P. Larry to enlist the Richmond Police Department's help in arresting Turner pursuant to arrest warrants issued for the burglary.  At the time of the offense, Turner and Zechman resided at 6001 Laveta Drive in the City of Richmond.

Captain Guthrie and Detectives O'Connell and Larry responded to that address and found Zechman in the home.  She allowed the officers into the house, and, after an initial

search failed to reveal Turner's whereabouts, Zechman stated that he had been spending time that day in a rear closet in the house working on something. The three officers checked a back room again and found Turner hiding in a hidden compartment under the furnace. After he was taken into custody, Turner cooperated with Captain Guthrie and the Detectives, implicated himself in the burglary, and agreed to take them to the location where he had sold eight of the firearms. Once in the car, Turner directed Captain Guthrie and the Detectives to the residence of an African-American male named "James," located at 149 Labrook Drive in the City of Richmond, not more than a few houses away from Zechman's residence.

While Captain Guthrie and Turner remained in the car, Detectives O'Connell and Larry walked to the front door of that residence. The Detectives knocked and identified themselves. An African-American male, later identified as defendant James E. Venable ("Venable"), opened the door. The Detectives then advised Venable that they were aware of his possession of stolen firearms. After Venable confirmed that the Detectives were not going to arrest him for possession of stolen firearms, he cooperated with the Detectives and agreed to relinquish the firearms. At that time, the Detectives were not aware of Venable's felon status, nor did they charge or arrest him. They

simply wanted to remove the firearms from the street and return them to their rightful owner.

The next day, January 29, 2008, Detectives O'Connell and Larry returned to Zechman's residence to arrest her. As the Detectives spoke with Zechman, Venable exited a vehicle and began to approach the Detectives and Zechman. The Detectives cut him off before he got to the side of the residence where Zechman was standing, at which point he began to yell and demand to know who had snitched on him. The Detectives spoke with Venable, who was extremely angry, and tried to calm him down, but he continued to be hostile during the conversation. At one point, Venable made a comment about having just left the penitentiary, prompting Detective O'Connell to relate to Venable that they had given him a break if he was a convicted felon, but Venable simply responded that his felon status was beside the point. Shortly thereafter, Venable got back into his car and left Zechman's residence.

After arresting Zechman, the Detectives checked Venable's criminal history, noted that he had been convicted of felony Statutory Burglary and felony Robbery in the Circuit Court for the City of Richmond on September 20, 1984, and then obtained a search warrant for Venable's residence at 149 Labrook Drive. The application for the warrant recited Venable's status as a felon, and the fact that, on the previous night, the Detectives

noticed a box of .45 caliber handgun ammunition in plain view on the top of a speaker next to a television when they followed Venable into his residence to retrieve the stolen firearms. During the execution of the search warrant, officers seized ammunition and a personal use amount of marijuana from Venable's home. After being advised of his _Miranda_ rights, Venable made incriminating statements, relating to officers that he had purchased the firearms for $1,500 and that he planned to sell them on the street for $3,000, statements also he had made the previous night when the Detectives retrieved the firearms from his residence.

For his role in the burglary and larceny of the firearms, Campbell County authorities charged Turner on January 24, 2008 with: (1) Statutory Burglary, in violation of Virginia Code § 18.2-91;[1] (2) Grand Larceny, in violation of Virginia Code § 18.2-95;[2] and (3) Possession of a Firearm by a Convicted Felon,

---

[1]    Section 18.2-91 states that "[i]f any person commits any of the acts mentioned in § 18.2-90 with intent to commit larceny, or any felony other than murder, rape, robbery or arson . . ., or if any person commits any of the acts mentioned in § 18.2-89 or § 18.2-90 with intent to commit assault and battery, he shall be guilty of statutory burglary."    Va. Code Ann. § 18.2-91 (2009).

[2]    Section 18.2-95 states that "[a]ny person who (i) commits larceny from the person of another of money or other thing of value of $5 or more, (ii) commits simple larceny not from the person of another of goods and chattels of the value of $200 or more, or (iii) commits simple larceny not from the person of another of another of any firearms, regardless of the firearm's

in violation of Virginia Code § 18.2-308.2[3]. On January 29, 2008, for her role in the burglary and larceny of the firearms, Campbell County authorities arrested and charged Zechman with the three same offenses as Turner. On January 29, 2008, Venable was arrested by Richmond Police and charged with Possession of a Firearm by a Convicted Felon, in violation of Virginia Code § 18.2-308.2.

Turner and Zechman were slated for prosecution in the Circuit Court for the Campbell County for their offenses. Venable was to be tried in the Circuit Court for the City of Richmond. Under a program commonly referred to as "Project Exile", however, the Commonwealth Attorney's Office for the City of Richmond presented Venable's case to the United States Attorney's Office ("USAO") for the Eastern District of Virginia, Richmond Division, for review and possible federal prosecution. On April 17, 2008, a Criminal Complaint was filed in the Clerk's Office of the United States District Court for the Eastern District of Virginia, Richmond Division, charging Venable with

---

value, shall be guilty of grand larceny." Va. Code Ann. § 18.2-95 (2009).

[3]     Section 18.2-308.2 makes it "unlawful for (i) any person who has been convicted of a felony . . . to knowingly and intentionally possess or transport any firearms or ammunition for a firearm, any stun weapon as defined by § 18.2-308.1, or any explosive material, or to knowingly and intentionally carry about his person, hidden from common observation, any weapon described in" § 18.2-308(A). Va. Code Ann. § 18.2-308.2(A) (2009).

Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1).[4]   The next day, April 18, 2008, the state charge against Venable was <u>nolle prossed</u> in the Circuit Court for the City of Richmond.   Then, on April 21, 2008, an indictment was filed in the District Court, charging Venable with violating 18 U.S.C. § 922(g)(1).   Venable was placed in federal custody on April 22, 2008.

State prosecutors in Campbell County indicted Turner and Zechman on April 30, 2008 for their offenses related to the burglary and the larceny of the firearms.   Both eventually pleaded guilty to the charges, Zechman on August 7, 2008, and Turner on November 4, 2009.   On December 18, 2008, Zechman was sentenced to five years of incarceration with five years suspended for Statutory Burglary, two years of incarceration with two years suspended for Grand Larceny, and one year of incarceration with one year suspended for Possession of a Firearm by a Convicted Felon.   All three of Zechman's sentences

---

[4] Section 922(g)(1) makes it unlawful for any person

> who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1) (2010).

were suspended on a condition that she must complete the Women's Adult Detention and Diversion Incarceration Programs. In addition, she was ordered to be of good behavior for a period of ten years and to comply with supervised probation for a period of three years following her release from incarceration.

On January 28, 2010, Turner was sentenced to five years of incarceration with five years suspended for Statutory Burglary, five years of incarceration with five years suspended for Grand Larceny, and five years of incarceration for Possession of a Firearm by a Convicted Felon, a term which Turner currently is serving in the Virginia Department of Corrections. Turner also was placed on supervised probation for five years following his release from incarceration.

After being indicted on the federal charge, Venable's case was assigned to the Honorable Richard L. Williams, United States District Court Judge, who set a jury trial for August 11, 2008. Before trial, Venable, who was represented by appointed counsel from the Federal Public Defender's Office, filed numerous pro se motions to dismiss his indictment, including a "Motion to Dismiss based on Racial Discrimination" filed on August 6, 2008, which Judge Williams denied on August 8, 2008. On August 11, 2008, a jury found Venable guilty of violating 18 U.S.C. § 922(g)(1). Judge Williams sentenced Venable to sixty months of incarceration, a downward variance from his calculated

guidelines range under the United States Sentencing Guidelines, and three years of supervised release.

Venable appealed his conviction to the United States Court of Appeals for the Fourth Circuit, claiming that the district court violated his Sixth Amendment right to counsel in not obtaining a voluntary and knowing waiver and forcing him to proceed pro se. United States v. Venable, 373 F. App'x 402, 403 (4th Cir. 2010). The Fourth Circuit agreed, reversed his conviction and remanded the case to the district court. Id. at 407. The Government elected to re-try Venable, and the case was reassigned to the undersigned for further disposition.

Venable, through court-appointed counsel, filed the pending motion to dismiss the indictment, claiming that the USAO selected him for prosecution under the Project Exile program because of his race in violation of the equal protection component of the Fifth Amendment's Due Process Clause. Venable also filed a motion for discovery respecting Project Exile and the decision to prosecute him under its auspices. In support of his motion and his request for discovery into the USAO's records related to its decision to bring the federal case against him, as well as the decisions to bring other state cases federally, Venable argues the following: (1) Turner and Zechman, who stole the firearms and then possessed and sold them in the City of Richmond, were not prosecuted federally because they are

Caucasian; and (2) that prosecutions in the Richmond Division of the USAO "for firearms offenses in the years proceeding [Venable's] prosecution represent a grossly disproportionate number of African American [sic] defendants as compared with white defendants." Def.'s Mem. at 1.

### October 5, 2010 Hearing into Defendant's Claims

On October 5, 2010, the Court held a hearing during which Venable presented evidence in the form of testimony and exhibits in order to satisfy his burden to gain discovery into the Government's records. First, he offered print-outs from the Circuit Court of Campbell County detailing the charges and dispositions of the charges against Turner and Zechman. He also offered a print-out of Turner's criminal history in the Circuit Court of the City of Richmond. The bulk of Venable's documentary evidence was contained in a spreadsheet he designated, "Compilation of District Court Records 2005 to 2007." According to Pamela Bishop, a paralegal investigator with the Office of the Federal Public Defender in Richmond, Virginia, the 178-page spreadsheet compiles all of the publicly available federal cases that had been filed in the Eastern District of Virginia, Richmond Division, for 2005, 2006, and 2007. Interns with the Office of the Federal Public Defender accessed the information through PACER and the Bureau of Prisons' website. The spreadsheet has seven relevant columns:

Case Number, Name of the Defendant, Charges, United States Code Section, Disposition, Counsel, and Race of the Defendant. Further information on the race of some defendants was gathered from the Federal Public Defender's own files and from the files of the Probation Office.[5]

Ms. Bishop performed quality control on the information as it was compiled, in addition to making sure the information was entered consistently for sorting purposes. She then sorted the master list to find those defendants charged with violating 18 U.S.C. § 922(g) or § 924(a).[6] From this information, she then determined the percentage of African-Americans charged with violating either provision by the Richmond Division of the USAO by year. For 2005, of the 114 individuals charged, 106 were African-American, resulting in a percentage of 92.98 percent. For 2006, of the 112 individuals charged, 98 were African-

---

[5] Ms. Bishop testified that the list of defendants with an unknown race that was sent to the Probation Office only contained defendants who were charged with violating either 18 U.S.C. § 922(g) or § 924(a). Mot. to Dismiss Hr'g Tr. 13:22-13:24.

[6] Section 922(g) makes it unlawful for various types of individuals, including convicted felons, those who are fugitives from justice, or those who are unlawful users of or addicted to any controlled substance, for example, from shipping or transporting in interstate or foreign commerce, or possessing in or affecting commerce, "any firearm or ammunition; or [receiving] any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g) (2010). Section 924(a) provides various penalties for violating § 922(g).

American, resulting in a percentage of 87.5 percent. Finally, for 2007, of the 90 individuals charged, 70 were African-American, resulting in a percentage of 77.78 percent. For the three combined years, of the 316 individuals charged, 274 were African-American, resulting in an overall percentage of 86.71 percent. Def.'s Ex. 8.

Finally, Venable introduced statistics compiled from the Circuit Courts of Chesterfield, Hanover, and Henrico Counties, Virginia and of the City of Richmond, Virginia detailing the number of African-American, Caucasian, and American-Indian defendants who were charged with violating Va. Code § 18.2-308.2, Def.'s Ex. 7, which is a similar provision to 18 U.S.C. § 922(g)(1). The statistics detailed the numbers of defendants who had their charges dismissed, who were found guilty, who had their charges nolle prossed, and who were found not guilty, all in the years 2005 through 2007. The Supreme Court of Virginia compiled the information at the request of the Office of the Federal Public Defender. Though the Court accepted the proposition that the City of Richmond is the only jurisdiction among the four jurisdictions that participates in Project Exile, Venable offered the statistics as a representation of "those white people who could have been prosecuted by the federal government [in the Richmond Division of the USAO] but were not." Mot. to Dismiss Hr'g Tr. 27:23-27:24.

Citing the defendant's rigorous burden in obtaining discovery from the Government's records on its prosecutorial decisions, the Government declined to present any evidence and rested on the defendant's burden. However, it then put forth, oral and written, arguments in opposition to Venable's motion and discovery requests based on an understanding of Project Exile not supported by evidence in the record. After further declining to explain the criteria used by the USAO and the Commonwealth's Attorney's Office in selecting those defendants to be prosecuted under Project Exile, the Government was given more time to decide whether it would offer testimony or evidence about Project Exile, and, specifically, how the Government administers it, its rationale, its workings, and the criteria employed for accepting and prosecuting cases under it. While the Court did not request information into the deliberative process used in Venable's specific case, Venable's motion and request for discovery sought information on the deliberative process respecting the decision to prosecute Venable, and not to prosecute Turner or Zechman.

The Government subsequently filed a Supplemental Response to the Defendant's Motion to Dismiss in which it recounted that Project Exile was implemented in 1997 in response to the "extraordinarily high homicide rate in the City of Richmond, which is a predominantly African-American community." Gov't's

Supplemental Resp. at 7. According to the Government, Project Exile's "foremost goal" "remains to reduce violent crime in the City of Richmond through federal prosecution of firearms related offenses." Id. Federal prosecution is achieved through collaboration between the United States Attorney for the Eastern District of Virginia, the Commonwealth's Attorney for the City of Richmond, the Richmond Police Department, and the Bureau of Alcohol, Tobacco, Firearms and Explosives. Id. Local law enforcement officials and the Commonwealth's Attorney refer some, but not all, firearm-related arrests in the City of Richmond to the USAO for review. Id. at 8. Thus, local investigation and state charges normally precede the USAO's involvement, but the USAO does not participate in the initial determination of which cases should be presented for federal review. Id. Following that review, the United States Attorney decides which cases to accept for federal prosecution.

At the time of Venable's federal indictment, Managing Assistant United States Attorney ("AUSA") Stephen Miller, in conjunction with a representative from the Commonwealth's Attorney's Office and local law enforcement, was tasked with reviewing City of Richmond firearm-related arrests for potential federal prosecution. Id. at 11. The current procedure for reviewing cases for federal prosecution, including cases through Project Exile, now proceeds differently from the procedure used

at the time of Venable's indictment. According to the Government, all cases presented for federal prosecution now are reviewed by an intake committee, which relies on the policies and procedures outlined in the United States Attorney's Manual ("USAM"), to determine whether a case is appropriate for federal prosecution. Id. at 11 n.6. While the Government "decline[d] to discuss the specific factors considered in the decision to prosecute" Venable, it asserted that a review of his case reveals that his prosecution complied with the charging policies found in the USAM. Id. at 11.

### PROJECT EXILE

Though the Government declined the Court's offer in this case to put forth testimony about Project Exile, its rationale, criteria, and processes, there has been limited testimony given in other cases where defendants have challenged Project Exile. The first, and by far most extensive, analysis of Project Exile occurred in United States v. Jones, 36 F. Supp. 2d 304 (E.D. Va. 1999).

> Project Exile is a project jointly undertaken by the Commonwealth's Attorney for the City of Richmond and the United States Attorney for the Eastern District of Virginia. It was conceived in November 1996 and implemented in the City of Richmond in February 1997. The Program was later expanded to the City of Norfolk. Both cities suffer from high rates of violent crime. While Richmond possesses only three percent of the Commonwealth's population, it

accounts for twenty-seven percent of its homicides.

The stated goal of Project Exile is to reduce violent crime by federally prosecuting firearm-related crimes whenever possible. Under Project Exile, local police review each firearm-related offense to determine whether the conduct alleged also constitutes a federal crime. See, e.g., 18 U.S.C. § 992(g) and 924(g) (prohibiting the possession of firearms by certain persons). In those cases in which the conduct alleged also constitutes a federal crime, local police refer the matter to the United States Attorney for the Eastern District of Virginia. If the United States Attorney obtains an indictment charging the defendant with federal firearm-related crimes, then the Commonwealth's Attorney drops the state charges, and the case proceeds in federal court.

Jones, 36 F. Supp. 2d at 307 (footnote omitted). To assist federal prosecutors with the additional workload provided by Project Exile cases, an Assistant Commonwealth's Attorney and one prosecutor from the Office of the Attorney General are assigned as Special Assistant United States Attorneys. United States v. Nathan, 202 F.3d 230, 232 (4th Cir. 2000); Jones, 36 F. Supp. 2d at 307.

Approximately a year-and-a-half after Project Exile was implemented in the City of Richmond, a similar Project Exile was implemented in Rochester, New York between state, local, and federal officials. United States v. Grimes, 67 F. Supp. 2d 170, 172 (W.D.N.Y. 1999); United States v. Manuel, 64 F. App'x 823,

827 (2d Cir. 2003). In Rochester, New York, "[t]he stated purpose of the Project Exile program is to federally prosecute firearms-related crimes in order to take advantage of federal pre-trial detention and sentencing statutes." Grimes, 67 F. Supp. 2d at 172. Project Exile also has been implemented in Albuquerque, New Mexico. United States v. Raymond, 369 F. App'x 958, 969 (10th Cir. 2010) ("'Project Exile' . . . involved a series of monthly meetings between the USAO and the District Attorney's Office in Bernalillo County. At such meetings, those in attendance would go over reports for the purpose of identifying cases which warranted federal prosecution by the USAO or further follow up by the ATF.").

DISCUSSION

## A.  Applicable Law

A selective prosecution claim by a defendant "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." United States v. Armstrong, 517 U.S. 456, 463 (1996). It asks a court to exercise judicial power over a "special province" of the Executive. Heckler v. Chaney, 470 U.S. 821, 832 (1985). The United States Attorneys, and the Attorney General, "retain 'broad discretion' to enforce the Nation's criminal laws." Armstrong, 517 U.S. at 464 (quoting Wayte v. United States, 470

U.S. 598, 607 (1985)). Such "latitude" is afforded to them because

> they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to "take Care that the Laws be faithfully executed." As a result, the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.

Id. (quoting U.S. CONST., Art. II, § 3) (quotation marks and citations omitted). Indeed, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).

A prosecutor's discretion, however, is "subject to constitutional constraints." United States v. Batchelder, 442 U.S. 114, 125 (1979). The equal protection component of the Due Process Clause of the Fifth Amendment imposes one such constraint, and requires "that the decision whether to prosecute [ ] not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" Armstrong, 517 U.S. at 464 (quoting Oyler v. Boles, 368 U.S. 448, 456 (1962)). "A defendant may demonstrate that the administration of a criminal law is 'directed so exclusively against a particular

class of persons . . . with a mind so unequal and oppressive'
that the system of prosecution amounts to 'a practical denial of
equal protection of the law.'"   Id. at 464-65 (quoting Yick Wo
v. Hopkins, 118 U.S. 356, 373 (1886)).

In order to rebut the presumption that a prosecutor has not
violated the equal protection clause, "a criminal defendant must
present 'clear evidence to the contrary.'"   Id. at 465 (emphasis
added) (quoting United States v. Chemical Found., Inc., 272 U.S.
1, 14-15 (1926)); see also United States v. Olvis, 97 F.3d 739,
743 (4th Cir. 1996).   The Supreme Court has explained why courts
are hesitant to review a decision to prosecute a defendant:

> Judicial deference to the decisions of these
> executive officers rests in part on an
> assessment of the relative competence of
> prosecutors and courts.   "Such factors as
> strength of the case, the prosecution's
> general deterrence value, the Government's
> enforcement priorities, and the case's
> relationship to the Government's overall
> enforcement plan are not readily susceptible
> to the kind of analysis the courts are
> competent to undertake." It also stems from
> a concern not to unnecessarily impair the
> performance of a core executive consti-
> tutional function. "Examining the basis of a
> prosecution delays the criminal proceeding,
> threatens to chill law enforcement by
> subjecting the prosecutor's motives and
> decisionmaking to outside inquiry, and may
> undermine prosecutorial effectiveness by
> revealing the Government's enforcement
> policy."

Armstrong, 517 U.S. at 465 (quoting Wayte, 470 U.S. at 607,
608).

In order to satisfy the "demanding" standard required to prove a claim of selective prosecution, the defendant must prove two elements. First, he must prove that the federal prosecutorial policy had a discriminatory effect, and, second, that it was motivated by a discriminatory purpose or intent. Id. at 465; Wayte, 470 U.S. at 608.

Not only is the standard of a motion to dismiss for selective prosecution demanding, but the showing that a defendant must make to obtain discovery on such a motion also "should itself be a significant barrier to the litigation of insubstantial claims." Armstrong, 517 U.S. at 464. If discovery is ordered,

> the Government must assemble from its own files documents which might corroborate or refute the defendant's claims. Discovery thus imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution. It will divert prosecutors' resources and may disclose the Government's prosecutorial strategy. The justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim.

Id. at 468. Therefore in order to obtain discovery, "a defendant must produce 'some evidence' making a 'credible showing' of both discriminatory effect and discriminatory intent." Olvis, 97 F.3d at 743 (quoting Armstrong, 517 U.S. at 468); United States v. Hastings, 126 F.3d 310, 313 (4th Cir.

1997). Such a credible showing "adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution." Armstrong, 517 U.S. at 470.

**The Defendant Has Failed to Produce Evidence Making a Credible Showing of Discriminatory Effect and Discriminatory Intent**

### 1. Evidence of Discriminatory Effect

As observed nearly eleven years ago in Jones, "Project Exile would be vulnerable on selective prosecution grounds if African-American defendants were routinely diverted from state to federal prosecution while prosecutors allowed similarly situated Caucasian defendants to remain in state court." Jones, 36 F. Supp. 2d at 311. Though federal prosecutors in that case denied that the decision to federally prosecute a Project Exile defendant was attributable to a defendant's race, the District Court took the "opportunity to express its concern about the discretion afforded individuals who divert cases from state to federal court for prosecution under Project Exile." Id. At that time, no witnesses could detail the specific process by which defendants are selected for prosecution under the program, a "disquieting" development, and one that "cast[] some doubt on the assertion that race [played] no role" in selecting defendants for the program. Id. at 311, 312 n.9.

Even in the case at bar, the USAO was given every

opportunity to present evidence or testimony respecting Project Exile, its processes, its rationale, how it is utilized, and the criteria used to select City of Richmond cases for federal prosecution. The Government, however, within its right, chose to rest on the contention that the defendant had not met his burden.

It would have been preferable to have had the Government make a fuller explanation about how generally cases are selected for inclusion in Project Exile and then are prosecuted in federal court. That is especially so given the expressions of concerns in Jones and the significant percentage of Project Exile defendants who are African-American. But, the United States Attorney's Office obdurately declined to take that course. Hence, the motion must be decided on the existing record which, unfortunately, leaves a considerable distaste because it is almost certain that the Government could have made a good affirmative showing had it not so woodenly embraced executive prerogative. That course did a considerable disservice to the record.[7] Nonetheless, to the analysis of that limited record, we now turn.

---

[7] There are times when the executive branch's fear that its prerogatives are being trenched upon border on the foolhardy because disclosure could most likely shut the door on arguments that lack merit. In those instances, and this is one, reliance on executive procedural prerogative disserves the need of the public to understand what its government is doing.

"To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." Armstrong, 517 U.S. at 465. In order to obtain discovery on his selective prosecution claim, Venable had to adduce some evidence making a credible showing that a similarly situated defendant of another race has evaded prosecution under Project Exile. Jones, 36 F. Supp. 2d at 312. Venable argues that Turner and Zechman were similarly situated individuals of another race who evaded prosecution under Project Exile. According to Venable, Turner and Zechman are similarly situated to himself because all three were convicted felons who possessed the same guns in the Eastern District of Virginia, Richmond Division. Def.'s Mem. at 2. Furthermore, Venable notes that Turner and Zechman burglarized a home in Campbell County, stole eleven firearms, and then transported them into, and sold them in, the City of Richmond. Id. Thus, Turner and Zechman's actions, according to Venable, "actually represented a far greater danger to the community" and "their conduct reflected a far greater need for harsh punishment." Id. On this basis and in perspective of the statistical evidence, Venable maintains that he has made a credible showing of discriminatory effect that satisfies his burden to obtain discovery into the Government's records. Id. at 3.

"Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors." _Olvis_, 97 F.3d at 744. The Fourth Circuit has observed that "'[t]he goal of identifying a similarly situated class of law breakers is to isolate the factor allegedly subject to impermissible discrimination,'" because "'[i]f all other things are equal, the prosecution of only those persons [to whom the factor applies] . . . gives rise to an inference of discrimination.'" _Id._ (alteration in original) (quoting United States v. Aguilar, 883 F.2d 662, 706 (9th Cir. 1989)). However, where the "'comparison group has less in common with [the] defendant, then [other] factors . . . may very well play a part in the prosecution.'" _Id._

In _Olvis_, the Fourth Circuit reviewed a discovery order issued by a district court in response to a selective prosecution claim brought by two African-American defendants who were involved in a "large and violent" crack cocaine conspiracy in the Williamsburg, and Newport News, Virginia area. _Id._ at 741. All twenty-five of the defendants that were indicted were African-American, and of the approximately fifty-five unindicted persons who also were involved in the conspiracy, five were Caucasian. _Id._ Of the two defendants to bring the selective prosecution claim, Olvis was considered to be the leader of the conspiracy, while the other defendant, Palmer, helped Olvis in

laundering his drug proceeds. Id. The Government argued that the unindicted Caucasian individuals were not similarly situated to Olvis and Palmer. Id.

The Fourth Circuit agreed, faulting the district court for only considering the conspirators' relative culpability, rather than taking "into account several factors that play important and legitimate roles in prosecutorial decisions." Id. at 744. Examples of such factors include: (1) a prosecutor's decision to offer immunity to an equally culpable defendant because that defendant may choose to cooperate and expose more criminal activity; (2) the strength of the evidence against a particular defendant; (3) the defendant's role in the crime; (4) whether the defendant is being prosecuted by state authorities; (5) the defendant's candor and willingness to plead guilty; (6) the amount of resources required to convict a defendant; (7) the extent of prosecutorial resources; (8) the potential impact of a prosecution on related investigations and prosecutions; and (9) prosecutorial priorities for addressing specific types of illegal conduct. Id. "Making decisions based on the myriad of potentially relevant factors and their permutations require the very professional judgment that is conferred upon and expected from prosecutors in discharging their responsibilities." Id. Thus, in rejecting the district court's "narrow approach" to the relevant factors to be analyzed, the Fourth Circuit held that

"defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." Id.

Applying its "fact-focused test," the Fourth Circuit concluded that Olvis and Palmer were not similarly situated to the unindicted Caucasian individuals. While Olvis was the head of the crack cocaine conspiracy, and prosecutors believed Palmer perjured herself before the grand jury and refused to cooperate further, the Fourth Circuit determined that two of the unindicted Caucasian individuals offered to assist in the investigation. Id. at 744-45. Moreover, the Government lacked sufficient evidence to prosecute two other Caucasian individuals and had no information concerning the fifth Caucasian individual. Id. at 745.

In addition, the Fourth Circuit found fault with the defendants' further evidence of discriminatory effect, a statistical study that showed that in the Norfolk-Newport News, Virginia area, "of all the federal crack cocaine trafficking prosecutions in federal court since 1992 in which the defendant's race was apparent, over 90% involved black defendants." Id. Whether or not the defendants were offering the study to show discriminatory effect or discriminatory intent, the Fourth Circuit determined that the study provided

25

"no statistical evidence on the number of blacks who were actually committing crack cocaine offenses or whether a greater percentage of whites could have been prosecuted for such crimes." Id. Without an appropriate basis for comparison, the percentage of African-American crack cocaine defendants proved nothing, unless it could be presumed that crack cocaine violations were committed proportionately by all races, an assumption rejected by the Supreme Court in Armstrong. Id. In sum, the Fourth Circuit concluded that Olvis and Palmer failed to produce some evidence making a credible showing of discriminatory effect in their attempt to gain discovery. Id.

In this case, while Venable has attempted to produce statistical evidence and has argued that Turner and Zechman are similarly situated defendants of another race who escaped prosecution under Project Exile, the statistical evidence suffers from the same flaws that the Supreme Court recognized in Armstrong and the Olvis factors do not warrant finding that all three individuals are similarly situated for the purpose of prosecution by the Government.

First, with respect to the Olvis factors, some are irrelevant to the facts of this case. For instance, nothing in the record revealed that the USAO offered immunity to either Turner or Zechman in exchange for their cooperation in the case or to expose further criminal activity. In addition, neither

party presented evidence respecting the defendants' candor and willingness to plead guilty, the amount of resources required to convict the defendants, the extent of prosecutorial resources, or the potential impact of a prosecution on related investigations and prosecutions.

With respect to the remaining <u>Olvis</u> factors, and cognizant of the notion that there is a "myriad of potentially relevant factors and their permutations [that] require the very professional judgment" of federal prosecutors, it cannot be said that Zechman, Turner, and Venable were not similarly situated. First, based on information in the record, the strength of the evidence against Zechman for possession of a firearm by a convicted felon was minimal when compared with that against Venable and Turner. While Venable relinquished possession of the stolen firearms when Detectives Larry and O'Connell appeared at his residence on January 28, 2008 and made subsequent incriminating statements to them about his plans for the firearms, and Turner implicated himself in the burglary when arrested and agreed to show officers where he had sold the firearms, the record reveals next to nothing about the strength of the evidence against Zechman.

Second, Zechman and Turner presented different prosecutorial profiles than Venable based on their respective roles in the ongoing criminal conduct. Zechman and Turner were

alleged to have burglarized a home in Campbell County, stolen firearms, and possessed firearms as convicted felons, while Venable was alleged only to have possessed a firearm as a convicted felon. The different prosecutorial profiles may be the single largest factor differentiating Venable from Turner and Zechman.

Third, the difference in prosecutorial jurisdictions also differentiated Zechman and Turner from Venable. The investigation into the burglary and larceny of the firearms was initiated by Campbell County authorities, and they had the prerogative to prosecute Turner and Zechman for their crimes in that county, just as the Commonwealth's Attorney for the City of Richmond had the prerogative to prosecute Venable for his possession of the firearms as a convicted felon in the City of Richmond, and only City of Richmond firearm-related arrests are recommended for federal prosecution under Project Exile. Even if the authorities in Campbell County wanted to prosecute Zechman and Turner federally for their crimes, they could not have done so in the Eastern District of Virginia because Campbell County lies within the Western District of Virginia. Moreover, Campbell County authorities expressed that they wanted to vindicate the rights of the owner of the firearms. Thus, given all of the circumstances and differentiating factors, Venable has failed to make a credible showing that a similarly

situated defendant of another race has evaded prosecution under Project Exile in order to obtain discovery into the Government's records.

Even if Venable had been able to make a credible showing of discriminatory effect, that alone is not enough to substantiate an equal protection claim. Rather, a "disparate racial impact must be accompanied by evidence of racial animus" or discriminatory intent. Jones, 36 F. Supp. 2d at 312 (citing Washington v. Davis, 426 U.S. 229, 239 (1976)). The defendant proves discriminatory intent by demonstrating that the decision to prosecute was "invidious or in bad faith." United States v. Greenwood, 796 F.3d 49, 52 (4th Cir. 1986) (quotation marks and citations omitted). In other words, the Government must be more than aware that a federal prosecutorial policy may result in the prosecution of one group more than another because discriminatory intent implies that the Government "selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." Wayte, 470 U.S. at 610 (quotation marks and citation omitted). Hence, "prosecutors may specifically target one activity for enforcement, even if that activity is primarily engaged in by members of one race, without necessarily violating the Constitution's guarantee of equal protection. And, given the presumption of regularity attending the exercise

of prosecutorial discretion, the evidence of discriminatory intent, must be clear." Jones, 36 F. Supp. 2d at 312 (citation omitted). Thus, to demonstrate discriminatory intent, Venable must show that the USAO prosecuted him because of his race.

Venable attempts to meet his burden by producing the statistic that for the three years preceding his prosecution, 86.71 percent of defendants charged with violating 18 U.S.C. § 922(g) or § 924(a) in the Eastern District of Virginia, Richmond Division, were African-American, despite a predominantly Caucasian population in the Division. Def.'s Mem. at 1. Venable also devotes pages of his brief to detailing statistics respecting crack cocaine defendants in the Eastern District of Virginia and to concerns expressed by district courts in this Division respecting Project Exile and crack cocaine sentencing disparities. The Government argues that Venable's statistics are flawed because they do not provide the percentage of Caucasian defendants who committed similar conduct but who were not prosecuted. Gov't's Resp. at 8.

In Olvis, the defendants attempted to bolster their selective prosecution claim by presenting an informal study suggesting that since 1992, more than ninety percent of the federal crack cocaine trafficking prosecutions in the Norfolk-Newport News, Virginia area were against African-American defendants. Olvis, 97 F.3d at 745. The district court agreed,

and found that "inadequately explained evidence of statistical disparity, . . . is a nonfrivolous showing of discriminatory intent." Id. The Fourth Circuit, however, determined that "[w]ithout an appropriate basis for comparison, raw data about the percentage of black crack cocaine defendants proves nothing. Such statistics could have relevance only if it could be presumed that crack cocaine violations were committed proportionately by all races -- a presumption the Supreme Court rejected in Armstrong as 'at war' with unchallenged statistics." Id. (quoting Armstrong, 517 U.S. at 470). In addition, "[e]ven if the study had a basis for comparison," that showed discriminatory effect, the Fourth Circuit found that it would not necessarily prove discriminatory intent. Id. at 746 (emphasis added). "This is consistent with the general rule that in cases involving discretionary judgments essential to the criminal justice process, statistical evidence of racial disparity is insufficient to infer that prosecutors in a particular case acted with a discriminatory purpose." Id. (emphasis added) (quotation marks and citation omitted).

Without an appropriate basis for comparison, Venable's statistics respecting the percentage of African-Americans convicted of firearms charges in the Richmond Division are not probative evidence of discriminatory effect or intent. Even if he were able to provide a basis for comparison, the Fourth

Circuit has observed that it would not necessarily prove discriminatory intent in his particular case, and the remainder of Venable's evidence on this point does not rise to the level required to obtain discovery on his selective prosecution claim. The Government, through Project Exile, has chosen to target firearm-related offenses in the City of Richmond, and though this prosecutorial policy may impact African-American defendants more than other races, it does not mean that the Government selected a particular course of action because of its adverse effects upon African-Americans. Given the standard required by the Supreme Court and the Fourth Circuit, Venable has failed to offer evidence demonstrating that the USAO prosecuted him under Project Exile because of his race.

## CONCLUSION

Based on the foregoing, the Defendant has failed to satisfy his rigorous burden to obtain discovery on his selective prosecution claim because he has not produced some evidence making a credible showing of discriminatory effect and discriminatory intent. Furthermore, the Defendant has failed to

satisfy his burden to dismiss the indictment for selective prosecution. The Defendant's motion will, therefore, be denied.

It is so ORDERED.

_____/s/_____ _RER_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January 26, 2011